## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

02 APR 30 PM 4:08

| | |
|---|---|
| BETTYE JANE ASHLEY, | ] |
| Plaintiff(s), | ] |
| vs. | ] CV-00-N-3463-E |
| SOUTHERN TOOL INC., | ] |
| Defendant(s). | ] |

**Memorandum of Opinion**

ENTERED
MAY 0 1 2002

### I.    Introduction

The court has for consideration the motion for summary judgment of defendant Southern Tool Incorporated (hereinafter "Southern Tool"). (Doc. # 39). Plaintiff Bettye Jane Ashley claims that Southern Tool violated Title VII and the Age Discrimination in Employment Act by affording more favorable treatment to younger men and women of Caucasian and African-American ethnicity in the enforcement of its No-Fault Attendance Policy. (Doc. # 1). Southern Tool contends that judgment is due in its favor because the plaintiff cannot establish a prima facie case of race, sex, or age discrimination; or in the alternative, cannot produce evidence showing that the reason proffered for her termination is a pretext for discrimination. (Doc. # 41). The issues have been briefed by the parties and are now ripe for decision. Upon due consideration, the court finds summary judgment due to be granted.

## II. Background

Plaintiff Ashley began working for the defendant in November of 1984. She was temporarily laid off in August of 1985, but was subsequently rehired in November of that year. She continued working for Southern Tool until the date of her termination, March 24, 2000. At the time of her termination, Ms. Ashley – a Caucasian female – was sixty-one (61) years old. From 1994 until her termination, Ms. Ashley worked as an inspector/cleaner in the Wax Department at Southern Tool. Her department manager at the time of her termination was Danny Medders.[1]

Southern Tool manages employee absenteeism through a No-Fault Attendance Policy. The policy provides that once an employee exhausts his or her sick/personal days, that employee receives an "occurrence"[2] for any subsequent absence from work, regardless of the reason for the absence.[3] Occurrences do not remain on an employee's record indefinitely, but are removed after a period of one year. Additionally, an employee's oldest occurrence is removed following ninety (90) days of perfect attendance from the last occurrence. Once an employee accrues five (5) occurrences, the human resources

---

[1] Medders worked as the Department Manager of the Wax Department from January 1994 through August 1997, and then from January 2000 until at least the day he signed his declaration, February 27, 2002.

[2] Occurrences are defined within the policy as any period when the employee is absent from work, and are assessed as follows: one-half occurrence is assessed for late arrival or early departure; one occurrence is assessed for single day absences or multiple days absences for a single cause through three days (absences exceeding three days must be verified by a doctor's statement or one occurrence will be assessed for each day after the initial three-day period); and an additional occurrence is assessed for failing to report an absence within two hours of normal start time.

[3] According to Martha Smith, Human Resource Manager for Southern Tool, employees are supposed to receive notice each time they accrue an occurrence. Ms. Ashley contends that she did not receive notices for each occurrence that she received. This fact and its relevance to her claims are of no moment, however, as Ms. Ashley does not contend that she was discriminated against by virtue of this aspect of the No-Fault Attendance Policy.

2

department sends the employee a "Notice of Occurrences" form, warning the employee that another occurrence will result in termination. If an employee accrues six (6) occurrences, the employee is terminated for excessive absenteeism.

Southern Tool employees terminated under the No-Fault Attendance Policy can seek a reversal of their termination by submitting a Request for Appeal form within three (3) days of termination. To complete the form, an employee must list the reasons underlying the occurrences and provide a statement as to how the employee will improve attendance and reduce absences to an acceptable level. What exactly happens after the form is completed, however, is the subject of some dispute between the parties.

Southern Tool contends that the employee's department manager reviews the form (with the assistance and advice of the human resources manager) and ultimately makes the decision whether to grant or deny the employee's appeal. If the appeal is denied, the termination stands. If the appeal is granted, the employee's termination is presumptively reversed, pending a meeting between the employee and the department manager and/or the human resources manager. According to Southern Tool, the factors relevant in this process include (a) the reasons underlying the occurrences; (b) the statement as to how the employee will improve attendance and reduce absences to an acceptable level; (c) the employee's sincerity regarding the statement of improvement and reduction; and (d) the employee's past attendance record.

Ms. Ashley adamantly disputes Southern Tool's characterization of its appeals process. She argues that the applicable procedure is that set out in Southern Tool's October 12, 1999, revised No-Fault Attendance Policy, which provides in relevant part:

> You may appeal your termination for excessive absenteeism within three days of termination by completing the Request for Appeal form in the Human Resources Office. A committee of three, Director of Human Resources, Operations Manager and/or Department Manager form the committee. In the appeal, all occurrences which led to the termination will be discussed. The committee will meet within three days of the appeal, you will not report for work during this time. The committee may grant one (1) more occurrence, if warranted.[4]

Although it is not clear to the court which appeals process should be applied, the court believes the record quite clearly establishes – for relevant analytical purposes – what process was applied to Ms. Ashley and to other employees at Southern Tool.

On or about March 10, 2000, Ms. Ashley received a Notice of Occurrences form indicating that she had accrued five occurrences and that one more would result in termination. On March 13, 2000, Ms. Ashley left work early and was out of work until either March 20 or March 21, 2000. Consequently, she received her sixth occurrence.[5] On March 23, 2000, Martha Smith, Human Resources Manager for Southern Tool, reviewed the attendance records for Ms. Ashley and realized that she had accrued six occurrences. Ms. Ashley was summoned to the human resources office, where Ms. Smith informed her that she was terminated pursuant to the No-Fault Attendance Policy. Ms. Smith also informed the plaintiff that she could request an appeal by completing a Request for Appeal form.

---

[4] The plaintiff disputes whether she received a copy of the October 12, 1999 policy, claiming that nothing in the record demonstrates such acceptance. The court is not entirely certain what inference the plaintiff would have it draw from this fact, given that she urges time and time again in her responsive statement of facts that the October 12, 1999 revised policy is the policy that must control the appeals process at Southern Tool.

[5] Plaintiff contends that she was misled by her group leader Diane Weber into thinking that if she presented a note from her doctor, she would only received one-half occurrence, rather than a whole occurrence. The evidence before the court, however, demonstrates that Ms. Weber was not charged with the responsibility to issue occurrences to the plaintiff, and that the whole occurrence plaintiff received was consistent with the No-Fault Attendance Policy.

Although it is disputed whether Ms. Smith provided the Ms. Ashley instructions on how to fill out the form, Ms. Ashley nonetheless filled out the form. The form listed nine occurrences, ranging between July 22, 1999 and March 17, 2000. Ms. Ashley provided the following reasons for the occurrences: (1) "re business mothers death"; (2) "meet w/ AOD [Anniston Ordnance Depot] re mother death"; (3) "meet with AOD credit union re mother"; (4) "re to filing papers w/ court re mother"; (5) "sick re nerves – Dr. excuse"; (6) "sick – before gallbladder surgery"; (7) "sick – re pneumonia"; (8) "sick – pneumonia"; and (9) "sick – pneumonia". In the section appearing beneath the heading "If I am granted an appeal and am reinstated, I will do the following to improve attendance and keep my absences at a minimum" Ms. Ashley wrote "Try not to get sick." During her deposition, plaintiff offered the following explanation for the statement:

> Q: So you wrote: Try not to get sick; right?
> A: Yes, sir.
> Q: You didn't make any other comments, did you?
> A: No, sir.
> . . . .
> A: Yes, I was hurt, and I guess this [statement] was just a little smart thing. I don't know. Like I said, I don't know. I was hurt. I was really hurt.
> Q: So when you wrote that down: Try not to get sick, that's something you really couldn't do to improve your absences, is it?
> A: Oh, no, sir. I don't guess.
> Q: And like you just say (sic), it was kind of a smart remark, is that –
> A: Well, I was – I felt like they was just striking out at me.
> Q: Why do you feel they were striking out against you?
> A: I don't know, that was just –
> Q: But it [the termination] was consistent with the policy, though; right?
> A: Yes, sir.

According to Southern Tool, Mr. Medders received plaintiff's Request for Appeal form the following day. He reviewed the information listed on the form, and concluded that some of the absences were avoidable. He also concluded that the "Try not to get sick" statement was sarcastic and evidenced a lack of sincerity on Ms. Ashley's part toward improving her attendance. Mr. Medders also took note of past attendance problems, and the fact that plaintiff had received several Notices of Occurrences shortly prior to her final occurrence. Accordingly, he denied Ms. Ashley's Request for Appeal, basing his decision on the belief that she should have avoided several of the occurrences; her failure to provide a plan for correcting her attendance problems on the Request for Appeal; the sarcasm and insincerity apparent on the form; and his knowledge of her recent attendance problems. Mr. Medders shared his decision and the rationale underlying it with Ms. Smith, and she apparently agreed with the ultimate decision.[6] Southern Tool did not permanently fill the vacancy created by Ms. Ashley's termination. Instead, her duties and responsibilities were primarily absorbed by a Caucasian woman six years plaintiff's senior. Assistance was also provided by an African American woman approximately seventeen years younger than Ms. Ashley. According to Ms. Smith, however, this woman retained her original job title, and

---

[6] Plaintiff's dispute with these facts rests not on their accuracy, but rather on the notion that a different procedure should have taken place. Taking the evidence in a light most favorable to plaintiff, the court will address the relevance of the alleged procedural anomaly *infra*. As to the other disputes plaintiff has with Southern Tool's accounting of the events surrounding her termination, the court notes that while Ms. Ashley may not have "occurred out" at any time prior to March of 2000, Ms. Ashley missed a total of 928 days (off work either on paid or unpaid leave) during her approximately 14 years of employment at Southern Tool. The court also notes that the Request for Appeal form lists the dates on which the occurrences underlying the termination took place. Finally, the court acknowledges that plaintiff testified during her deposition that Ms. Smith told her that the primary reason driving Mr. Medders' decision to deny her request for appeal centered upon his belief that three occurrences related to her mother's death could have been avoided. The court notes, however, that Ms. Smith testified in her deposition that other reasons supported the decision to deny Ms. Ashley's appeal, including her attendance history, the lack of sincerity evident in the "Try not to get sick" statement, and the failure by Ms. Ashley to formulate a plan to improve her attendance.

6

helped only with overrun and to fill in when necessary.

Ms. Ashley filed this action on December 1, 2000. In her complaint, she alleges that Southern Tool terminated her on account of her race, gender, and age, in violation of Title VII and the ADEA. Support for these claims comes primarily from examples of employees who Ms. Ashley believes received more favorable treatment than her in the termination process, and an alleged conversation she had with a former Southern Tool employee, Mark Wesley. The court will elaborate on this evidence in greater detail *infra*.

### III.    Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also DeJulio v. Georgia*, 276 F.3d 1244, 1248 (11th Cir. 2001). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotations omitted); *see also Comer v. City of Palm Bay*, 256 F.3d 1186, 1192 (11th Cir. 2001); *Crawford-El v. Britton*, 523 U.S. 574, 600 n.22 (1998). The movant can meet this burden by presenting evidence showing that there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-

7

23. Once the moving party has met this burden, "the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)); *see also Comer, supra.*

The court must grant a motion for summary judgment if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249 (citations omitted); *accord Dzikowski v. NASD Regulation, Inc. (In re Scanlon)*, 239 F.3d 1195, 1198 (11th Cir. 2001); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). In rendering its decision, "[a] court 'must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'" *Hinson v. Clinch County Bd. of Educ.*, 231 F.3d 821, 826-27 (11th Cir. 2000) (quoting *Reeves*, 530 U.S. at 150); *see also Comer, supra.*

### IV. Discussion

#### A. The Wesley Conversation

In an effort to facilitate consideration of this motion, the court will first address the

evidence proffered by plaintiff concerning Mr. Wesley and a conversation he allegedly had with her. During her deposition, Ms. Ashley testified that she spoke with Mr. Wesley soon after her termination. Mr Wesley allegedly told her that he had seen a list with her name on it. The list apparently included the names of people targeted for termination as a result of their older age. Ms. Ashley also testified that she was to talk with Mr. Wesley at some later date in an effort to obtain this list. At the time of her deposition, she had not done so.

Mr. Wesley contends that nothing of this sort ever transpired between the two of them. In a declaration made under penalty of perjury, Mr. Wesley claimed that he had neither seen her name on such a list nor had he seen such a list or even knew of one's existence. Mr. Wesley stated that he spoke with Ms. Ashley regarding her termination at some time early in 2000 (having himself been terminated several months earlier), at which time he expressed his opinion that Southern Tool was terminating employees who had been with the company the longest in an effort to reduce costs. Mr. Wesley also stated that no one at Southern Tool directly or indirectly indicated the existence of such a policy to him, and that he had no proof that such a policy was in effect. This belief was simply his opinion.

Having reviewed the evidence, the court concludes that plaintiff's deposition testimony with respect to the Wesley conversation must be excluded from consideration as inadmissible hearsay. "The general rule is that inadmissible hearsay[7] cannot be considered on a motion for summary judgment. Rule 56(e) of the Federal Rules of Civil Procedure requires that affidavits that support or oppose summary judgment motions shall

---

[7] Inadmissible hearsay is an out-of-court statement, not otherwise excepted under the Federal Rules of Evidence, offered to prove the truth of the matter asserted therein. *See Macuba v. DeBoer*, 193 F.3d 1316, 1322 n.11 (11th Cir. 1999) (citing Federal Rules of Evidence 801-804).

9

be made on personal knowledge, [and] shall set forth such facts as would be admissible in evidence. This rule also applies to testimony given on deposition." *Macuba v. DeBoer*, 193 F.3d 1316, 1322-23 (11th Cir. 1999) (citations and quotations omitted). Although there are situations where a less-than-rigid application of this rule is warranted, the instant case virtually replicates the facts driving the *Macuba* case cited *supra*. *See Macuba*, 193 F.3d at 1323-25. There a district court denied a motion for summary judgment in heavy reliance upon deposition testimony that included statements by the deponent that third parties possessed a list of employees (including the plaintiff) targeted for termination. *See id.* at 1322. Finding such reliance to constitute error, the circuit court stated:

> it should be apparent that the district court erred in considering the hearsay testimony of Leonard. First, all of the statements Leonard claims were made to him were being offered for their truth: that DeBoer and Youseff had a hit list of people in the land use departments, including Macuba, they wanted fired; [and] that Macuba was on the hit list . . . . Second, none of the statements made to Leonard would be admissible at trial under an exception to the hearsay rule. Finally, even though the statements made to Leonard might be admissible to impeach Forgey (if he testified), they would not be admissible as substantive evidence.

*Id.* at 1325. This court therefore finds the deposition testimony of Ms. Ashley, insofar as it recounts the alleged conversation she had with Mr. Wesley, inadmissible hearsay and excludes it from consideration on this motion.

### B.     Ms. Ashley's Claims of Discrimination

Both the parties and the court are in agreement that the analytical framework appropriate for both plaintiff's Title VII and ADEA claims is that set forth in the cases of *McDonnell Douglas*, *Burdine*, and their progeny. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1024-25 (11th Cir. 2000); *Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999);

see also *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141-42 (2000); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. Comm. Affairs v. Burdine*, 450 U.S. 248 (1981). Under this framework, as applied to the particular posture of this case, the plaintiff has an initial burden of proving her prima facie case, the elements of which are: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees who are not members of her class more favorably; and (4) she was qualified for the position at issue. *See Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 842-43 (11th Cir. 2000); *Maniccia*, 171 F.3d at 1368. Southern Tool contends that Ms. Ashley is unable to satisfy either the third or fourth prong of her prima facie case. As to the third prong, the court agrees.

The third prong of plaintiff's prima facie case requires her to prove that her employer treated similarly situated employees who are not members of her class more favorably. In carrying her burden here, plaintiff must satisfy the court that the employees allegedly receiving favorable treatment are, in fact, similarly situated. "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) (quoting *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir. 1998). Courts must make certain, however, that the employees are in sufficiently like postures before considering the challenged actions of an employer. Approaching claims in such a way avoids "second-guessing employers' reasonable decisions and confusing apples with oranges." *See Silvera*, 244 F.3d at 1259; *see also*

11

*Maniccia*, 171 F.3d at 1368-69 (citation omitted); *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners.").

Ms. Ashley maintains that several employees at Southern Tool similarly situated to her received more favorable treatment in the termination and appeals process. The defendant contends that these employees are not similarly situated, because the circumstances surrounding their termination and appeal vastly differ from those surrounding Ms. Ashley's termination. As an example, Southern Tool notes that none of the alleged similarly situated employees filled out a portion of their Request for Appeal in a sarcastic and incomplete fashion that evidenced a lack of sincerity toward improving attendance. Southern Tool also notes that many of the alleged similarly situated employees had their requests for appeal reviewed by a department manager other than Mr. Medders.

Ms. Ashley contends that the difference in decision-maker is of no moment when the reason for the adverse action is the violation of objective criteria (in this case a published employee attendance policy) as opposed to subjective criteria. Furthermore, she attacks Southern Tool's reliance on her sarcastic and incomplete comment on the Request for Appeals form. Ms. Ashley argues that Mr. Medders made the decision to deny her Request for Appeal, instead of the Appeals Committee after a full review of all the occurrences that led to her termination. According to plaintiff, the latter approach is set forth in the October 12, 1999, revised No-Fault Attendance Policy as the means for review, and the fact that it was not followed in her case calls into question the credibility of the reason proffered for her termination. The court turns to this second argument.

In considering the evidence as a whole, the court notes that no employee terminated after October 12, 1999 and proffered as a comparator in this case received committee review of the type described by either Ms. Ashley in her arguments to this court or the revised attendance policy.  This includes Frank Rawls, Robert Stephens, Chad Mullinax, Leon Dudley, Nelson Christian, Anthony Strauder, and Mike Milan, as well as three other employees, whose termination and appeal process occurred post October 12, 1999 and involved Mr. Medders directly (Don Moszynski, terminated February 19, 2001; Carolyn Whitfield, terminated in August 2001; Rosemary Hood, terminated August 15, 2001).  Thus, the fact that Mr. Medders decided to deny plaintiff's Request for Appeal, instead of a committee, seems entirely consistent with the termination and appeals process being practiced at Southern Tool, if not for the company's stated policy.  The failure of this practice to adhere to the stated policy does not undermine or call into doubt the actions taken by Mr. Medders, especially in light of the practice's indiscriminate application. *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1261 (11th Cir. 2001) (and cases cited).

The court is also, contrary to the argument of plaintiff, required to consider the identity of the decision-maker in determining whether employees are similarly situated.  The Eleventh Circuit has reiterated this point on several occasions.  *See e.g., Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1261 n.5 (11th Cir. 2001); *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1312, n.7 (11th Cir. 1998); *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989).  The case cited by plaintiff, *Anderson v. WMBG-42*, 253 F.3d 561 (11th Cir. 2001), does not change this rule.  The *Anderson* Court merely clarified what seems evident in the cases cited *supra*, namely that a difference in decision-makers is an

13

important factor to consider, but is not standing alone outcome determinative. *See Anderson*, 253 F.3d at 565-66. Ms. Ashley's argument that the identity of the decision-maker is not relevant appears rooted more in the following statement from *Anderson* than in any notion that *Anderson* changed existing law: "In some cases, the determination of whether comparators are similar will be an easier task than in others, for example, when two employees have violated the identical rule or expressed work policy." *Anderson*, 253 F.3d at 564. Whether or not this statement supports plaintiff's theory, the court notes that the challenged employment action is not plaintiff's initial termination, but the decision by Mr. Medders to deny her Request for Appeal and to uphold that termination. The latter adverse action occurred at the hands of a decision-maker, applying judgment rather than rote policy or rule. The former adverse action occurred through the application of policy and rule, but this action is not challenged.[8]

Having reviewed the principles *supra*, as well as the arguments of the parties, the court finds that plaintiff has failed to satisfy the third element of her prima facie case. Several employees[9] fail to qualify as similarly situated for multiple reasons: none of these employees had his or her termination and appeal handled by Mr. Medders; and none of these employees completed a portion of their Request for Appeal form in a sarcastic and

---

[8] This distinction is equally applicable to Southern Tool's argument that Ms. Ashley cannot meet the qualification prong of her prima facie case by virtue of her being terminated pursuant to the No-Fault Attendance Policy. The issue of disparate treatment in this action arises not from Ms. Ashley's initial termination pursuant to that policy, but in the subsequent events that transpired with respect to her appeal. The cases cited by Southern Tool in no way envision or encompass a set of facts like those presented here, and in the absence of more compelling case law, the court declines to extend their reach to the present circumstances.

[9] The employees referred to here are Leon Dudley, Dwight Quinn, Patrick Cunningham, Reena Stephens, Chad Mullinax, Frank Rawls, Robert Stephens, Nelson Christian, Anthony Strauder, and Mike Milan.

incomplete fashion that evidenced a lack of sincerity toward improving attendance. The court further finds that the three employees[10] who did have their terminations and appeals handled by Mr. Medders also fail to qualify as similarly situated. None of these three employees completed a portion of their Request for Appeal form in a sarcastic and incomplete fashion that evidenced a lack of sincerity toward improving attendance. Indeed, Mr. Medders stated in his declaration that each of these three employees indicated on their respective Request for Appeal forms a sincere desire to improve attendance and a plan to correct the problem with absences that was absent from Ms. Ashley's form. The law of this circuit requires similarly situated employees to be "similarly situated in all relevant aspects to the non-minority employee." *Silvera*, 244 F.3d at 1259. In the quite relevant aspect of sincerity to improve attendance, plaintiff has failed to show how her proposed comparators are similarly situated. Accordingly, the court finds that plaintiff has failed to satisfy the third prong of her prima facie case of race, age, or gender discrimination.[11] Summary judgment on all claims is thus due to be granted.

---

[10] The employees referred to here are Don Moszynski, Carolyn Whitfield, and Rosemary Hood.

[11] Two additional points merit brief discussion. First, assuming *arguendo* a prima facie case against Southern Tool, plaintiff has in no way carried her burden in showing that Southern Tool's proffered non-discriminatory reasons are pretextual. See *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000)

> (A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.)

Ms. Ashley has attempted to demonstrate pretext by showing that she did not receive committee review pursuant to the process outlined in the October 12, 1999 revised No-Fault Attendance Policy, but as the court's discussion *supra* should make clear, the evidence as a whole demonstrates that Ms. Ashley's failure to receive committee review was consistent with the practice applied to all persons terminated via the No-Fault Attendance Policy after October 12, 1999. Moreover, the fact that the policy is no-fault defeats any inference this court might draw from the fact that plaintiff's absences might well have been justifiable. Plaintiff admitted that each occurrence was rightfully given and that she was terminated in complete accordance with the No-Fault Attendance Policy.

15

## V. Conclusion

The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this 30th of April, 2002.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE